**ADAMS OUTDOOR ADVERTISING, LTD., a Limited Partnership, organized under the Laws of the State of Minnesota, by its managing general partner, Adams Outdoor Advertising, Inc., Petitioner**

v.

**DEPARTMENT OF TRANSPORTATION, Respondent.**

Commonwealth Court of Pennsylvania.

Submitted on Briefs Aug. 6, 2004.
Decided Sept. 22, 2004.
Reargument Denied Nov. 29, 2004.

Victor F. Cavacini and William J. Fries, Allentown, for petitioner.

Joel W. Williams, King of Prussia, for respondent.

BEFORE: McGINLEY, Judge, LEADBETTER, Judge, KELLEY, Senior Judge.

OPINION BY Judge McGINLEY.

Adams Outdoor Advertising, Ltd. (Adams) petitions for review of the order of the Secretary of the Pennsylvania Department of Transportation (Secretary) that denied Adams' exceptions and adopted a proposed report of a Department of Transportation Hearing Officer[1] to revoke Adams' advertising device permit No. 6–701 pursuant to 67 Pa.Code § 445.8(b)(5).

By official notice dated January 25, 1995, the Pennsylvania Department of Transportation (Department) informed Adams that "[t]he sign, for which the permit is hereby revoked, shall be removed by the persons, at their cost, responsible for the erection or maintenance thereof within 30 days ..." as a result of "[t]his recorded pre-existing nonconforming, V-shape, non illuminated, wooden sign structure has been totally removed" and that "[t]he sign was classified as nonconforming because the location was and still is zoned residential, therefore the sign may not be replaced." Department of Transportation's Notice of Revocation of Advertising Device Permit, January 31, 1995, at 1; Reproduced Record (R.R.) at 8a. The revocation was appealed and a hearing requested.

At a hearing, Ben Naska (Naska), highway beautification manager for Engineering District 6–0, testified that permit 6–701[2] was issued on June 3, 1974, to United

---

1. The hearing was held before Robert H. Raymond who identified himself as "Presiding Officer." Presiding Officer Raymond retired and Andrew W. Cline was appointed by the Secretary as Department Hearing Officer (Hearing Officer). Therefore, this Court shall use the terms "Presiding Officer" and "Hearing Officer" interchangeably where applicable.

2. In 1988, Pennsylvania "consolidated the permit system for numbers and they took permits that had two or more faces were consolidated to represent one face or one sign

Advertising Corporation for "a V-shaped sign ... 12–by–25, wood, and it says, legend, changeable copy; in other words, the faces always change." N.T. at 25 and 29; R.R. at 78a and 82a. Naska issued the revocation notice because now "the sign had Adams Outdoor Advertising on it, and it was an I-beam structure, V-shaped, had lights, electric, four uprights ... a catwalk ... and its steel ..." and that the original sign was wooden. N.T. at 89–91; R.R. at 142a–144a.

Adams elected not to present any evidence. The Hearing Officer issued a proposed report and made the following pertinent findings of fact:

1. On May 14, 1974, United Advertising Corporation submitted to the Department of Transportation an application for an outdoor advertising device permit for an existing sign "located, within the 'protected area' of a highway on the National System of Interstate and Primary Highways."

2. The application represented the sign location as follows:

TR611 LR156 Beautification Sec. 6

Nockamixon Twp., Bucks County, PA

E/s Hwy. 611, approx. .8 mi. S/o Ferndale

3. The application further represented that the sign had two faces and was located in a zoned commercial or industrial area.

....

5. On June 3, 1974, the Department approved the application as submitted and issued two permits, one for each face, Permit No. 6–701 and Permit No. 6–702.

6. Sometime subsequent to the issuance of the permits, the Department

location, so the 702 on today's record was combined with 701." *See* Notes of Testimony

consolidated the two permits into one, Permit 6–701, and Adams Outdoor Advertising ("Adams") succeeded to the rights and interest of United Advertising Corporation in the sign and permits.

7. By letter mailed January 31, 1995, and addressed to Adams, the Department revoked Permit 6–701.

8. The Department's letter (a) asserted that "the sign was classified as nonconforming because the location was and still is zoned residential" and (b) that the sign had been replaced with a new sign and was therefore deemed abandoned under the Department's regulation.

9. ... The Department requested that the sign (now designated No. X06–2035) be removed as illegal.

10. Adams appealed the Department's revocation notice ... and the Department's removal request. ...

11. The evidence introduced at the hearing established the following:

(a) "TR611 LR156" (now known as S.R. 611) is a federal-aid primary highway.

(b) According to an official Nockamixon Township zoning map, the area in which the sign is located was zoned residential as of 1968.

(c) According to an official Nockamixon Township zoning map, the area in which the sign is located was zoned residential as of 1991.

(d) Prior to 1995, when the Department issued the revocation notice and removal request, the wood sign had been replaced by a steel structure.

12. Official notice may be taken that the zoning map and ordinance of Nockamixon Township in effect on May 14, 1974 and June 3, 1974, designated the

(N.T.), October 24, 1996, at 68; R.R. at 121a.

area in which the sign is located as a residential district.

Hearing Officer's Proposed Report (Proposed Report), November 25, 2003, Findings of Fact (F.F.) Nos. 1–3, and 5–12 at 1–3.

The Hearing Officer concluded that the "sign ... was a nonconforming sign under the Department's regulations when the Department issued permits for the sign" and that "[u]nder the Department's regulations, a nonconforming sign is deemed abandoned if it is improved in any manner ... [and][a]n abandoned sign is not eligible for a permit." Proposed Report, Conclusions of Law Nos. 2, 3, and 4 at 7. The Hearing Officer proposed sustaining the revocation of the permit and the removal of the sign. The Secretary denied Adams' timely exceptions to the proposed report.

**Whether The Secretary Erred When He Determined That The Sign Was Located In A Residential Zoning District?**

█ Initially, Adams contends[3] that United Advertising Corporation's (United), Adams' predecessor in interest, 1974 application indicated that the sign was located in a commercial/industrial zoning district and that the Department failed to present credible evidence to support its position that the sign was located in a residential zoning district. Adams asserts that the Secretary[4] accepted testimonial evidence that consisted of handwritten and/or typed notations on the 1968, 1977, and 1991 Nockamixon Zoning Maps to establish that the sign was located in a residential zoning district. This Court shall address each of Adams' evidentiary challenges.

*A. The 1974 Permit Application*

Adams contends that United's 1974 Permit Application listed the proposed zoning location for the sign as commercial/industrial and that this zoning classification was evidenced on the 1974 advertising device information card.[5]

Naska testified that the sign was located in a residential zoning district as evidenced by the building permit for the residence located on the property and the Zoning Maps.[6] Naska stated that the original sign

---

**3.** This Court's review on an appeal from an administrative agency decision is whether necessary findings of fact are supported by substantial evidence, whether an error of law has been committed, or whether constitutional rights were violated. *Mike's Sign Company v. Department of Transportation,* 164 Pa. Cmwlth. 292, 642 A.2d 634 (1994).

**4.** This Court notes that Adams' arguments refer only to the Secretary, and not the Hearing Officer, even though the Hearing Officer, and not the Secretary, conducted the hearing and admitted the challenged evidence into the record. As a result, this Court shall refer to the appropriate individual, i.e., Secretary, Hearing Officer or both where appropriate.

**5.** An advertising device information card indicates the sign location and information reflected on the permit application. *See* N.T. at 63; R.R. at 116a.

**6.** Susan W. Shenkin (Shenkin), Commonwealth attorney, to Naska:

Q: I'm going to show you a document which has been marked R–6 and ask you if you can identify this.
A: Yeah, this was another document that was in the file, and the date that's printed on the back is June 9, 1979. *I pulled this out, located the approximate location of the sign, utilizing existing plans that were in the file, to determine what the zoning was, because that's our normal job. We have to know what the zonings are for the sign locations.* (emphasis added).
...
Q: What is this rectangle? What does this rectangle represent?
A: It's the physical design that was determined to be the location of where the sign is in reference to the Township.
....
Q: Okay. Now, I'm going to ask you to identify this larger map which has been marked Exhibit R–7.
A: Yes. While in consultation with the Township, this plan was ... submitted to

was wooden and that it had been replaced by a steel sign with a catwalk and lighting. *See* N.T. at 90; R.R. at 143a. Adams offered an uncorrected copy of the advertising device information card to challenge Naska's testimony. However, Naska stated that the information contained on Adam's copy of the 1974 advertising device information card was incorrect.[7]

There is substantial evidence [8] to support the Hearing Officer's determination that the sign was located in a residential zoning district and the Secretary did not err by incorporating the findings of fact and conclusions of law of the Hearing Officer and denying Adams' exceptions.

### B. 1968, 1977, and 1991 Zoning Maps of Nockamixon Township

Adams contends that these Zoning Maps not only fail to support the Secretary's factual conclusion that the subject property was zoned residential in 1968, 1977, and 1991, but that the property was zoned residential in 1974. Specifically, Adams states: 1) that the only reference to the 1968 Zoning Map was a notation in the lower left hand corner of the Map that stated "prepared by Richard S. Cowan and Assoc., Inc.1968"; 2) that the 1977 Zoning Map was a copy of the 1968 Zoning Map with the exception that it contained the date of December 19, 1977; and 3) that

1991 Zoning Map only contained the following, "revised August 1991." Adams asserts that the Department failed to present the testimony of any Nockamixon Township official to verify the Zoning Maps were in effect and relevant for the years referenced on the Maps; therefore the Maps should not have been admitted into evidence.

The Secretary determined that the 1968, 1977, and 1991 Zoning Maps established that the property was zoned residential:

With respect to the zoning maps, the hearing record contains the following critical documents:

- A zoning map dated 1968, stamped "PRINTED MAY 26, 1977, and embossed with the raised seal of the township (Exhibit R5).
- A zoning/wetlands/tax/floodplain map "REVISED AUGUST 1991," embossed with the raised seal of the township (Exhibit R7).
- The "CERTIFICATE" of the township secretary/treasurer attesting, as custodian, to the authenticity of the above documents as "full, true and correct copies," and embossed with the raised seal of the township (Exhibit R8).

In addition, the parcel on which the Adams [sic] billboard is located is marked on the maps and its location was

---

me by the Township. The highlighted area on the older plans was then transferred—highlighted, which I did, to the updated plans, and now we have a parcel number which is 197, so now we can identify the land that that we're on, 197, and *the zoning's still residential.* (emphasis added).
N.T. at 47–48; R.R. at 100a–01a.

7. Victor F. Cavacini (Cavacini), Adam's attorney, to Haska:
Q: What did you use on R–11 [advertising device information card] in the way of ink?
A: That said that the zoning was commercial and it would change it to residential

and that was when we identified the sign as being residential prior to any revocation notices sent out.
N.T. at 128–29; R.R. at 181a–82a.

8. It is well-established that substantial evidence is such relevant evidence as a reasonable person might accept as adequate to support a conclusion. *Empire Steel Castings, Inc. v. Workers' Compensation Appeal Board (Cruceta)*, 749 A.2d 1021, 1024 (Pa.Cmwlth. 2000). When performing a substantial evidence analysis, this Court must view the evidence in a light most favorable to the party who prevailed before the fact finder. *Id.*

corroborated by testimony and by certified tax and zoning records. All of this evidence indicates that the property on which the billboard was located was zoned residential, and not commercial or industrial, at the time that the Department granted the permit. There is no substantial evidence to the contrary.

Turning to Adams' exceptions, I reject the contention that the township's records do not meet admissibility standards under the Judicial Code. Specifically, I reject the assertion that Exhibit R8 was not properly sealed because, in fact, it is certified by the secretary/treasurer and embossed with the raised seal of "Nockamixon Township." I also believe that records which show that the property was zoned residential in 1968, 1977, and 1991 can support an inference that the property was zoned residential in the period May/June 1974 and therefore, permit me to find as fact that the billboard is located in an area which was zoned residential when the permit was issued.

Secretary's Memorandum Opinion and Order (Opinion), March 2, 2004, at 3–4; R.R. at 435a–36a. Again, this Court finds no error with the Hearing Officer's evidentiary rulings and the Secretary's denial of Adams' exceptions.

## C. The November 4, 2003, Submission Of The Nockamixon Township Zoning Ordinance And Zoning Map

By order of September 22, 2003, the Hearing Officer notified the parties as follows:

> The parties are further notified that I intend to take official notice of the zoning ordinances of Nockamixon Township, Bucks County, pursuant to 42 Pa. C.S. § 6107(a). Counsel for the Department is requested to submit, within 20 days, a certified copy of the ordinance(s) establishing the zoning districts in effect on May 14, 1974, and June 3, 1974. See 42 Pa.C.S. § 6107(b).

Order of September 22, 2003, at 1.[9]

Adams contends first, that the Hearing Officer's request of the Nockamixon Zoning Ordinance was an inappropriate re-opening of the evidence, and second, that the certification of the Zoning Ordinance and Zoning Map was accomplished without the necessary testimony to establish their authenticity.

First, 1 Pa.Code § 35.128 (additional evidence) provides:

> At a stage of the hearing, the agency head or the presiding officer may call for further evidence upon an issue, and require the evidence to be presented by the party or parties concerned or by a staff attorney either at that hearing or at the adjournments thereof. At the hearing, the agency head or the presiding officer may, if deemed advisable, authorize a participant to file specific documentary evidence as a part of the record within a fixed time, expiring not less than 10 days before the date fixed for filing and serving briefs.

Here, the Hearing Officer acted in compliance with 1 Pa.Code § 35.128 when he determined to develop a full record by requiring the parties to submit the Zoning Ordinance. Specifically, the Hearing Officer stated in his order that he

---

9. The Office of Chief Counsel complied with the Hearing Officer's Orders: "Per your Orders of September 22, 2003 and October 15, 2003, please find a certified copy of the ordinances establishing the zoning districts in effect on May 14, 1974 and June 3, 1974." Letter from Joel West Williams, Assistant Counsel, to Hearing Officer Andrew H. Cline, November 3, 2003, at 1; R.R. at 267a. The Assistant Counsel attached the official Nockamixon Zoning Map, effective from 1968 to 1984 to the Zoning Ordinance.

intended to take official notice of the Zoning Ordinance.[10] Further, the Zoning Ordinance was properly admitted under 42 Pa.C.S. § 6107 which provides that "[t]he ordinance of municipal corporations of this Commonwealth shall be judicially noticed" and that *"[t]he tribunal may inform itself of such ordinances in such a manner as it may deem proper and the tribunal may call upon counsel to aid it in obtaining such information."* (emphasis added). The Hearing Officer properly admitted the Nockamixon Zoning Ordinance into the record.

Second, Adams challenges the Zoning Ordinance and the Zoning Map on the basis that the certifications of these documents were ineffective without testimony to establish their authenticity. The Secretary's analysis of this issue is as follows:

> Adams also attacks the admissibility and veracity of the ordinance and map that were subject to the notice. As to admissibility, it claims that the certifications on the documents contained improper testimonial language, or "opinions of fact," because they indicated the effective dates of the ordinance and map. However, the certification of official records is by nature testimonial because it requires a public official to assert, at the very least, custodianship and authenticity. Typically, the secretary of a local government unit will certify that a resolution was adopted at a specified meeting on a certain date and remains in effect. Often, a certification represents that the attached records are all of the agency's records relating to a certain person, time period, location, or

event. These may be testimonial assertions, but they are accepted as a necessary part of a proper certification under the law. The Judicial Code itself actually authorizes testimonial statements as to the absence of certain official records or entries. See 42 Pa.C.S. § 6103(b) ("written statement that after an examination of the records of the government unit no record or entry of a specified tenor is found to exist").

> As to the veracity of the certified documents, Adams makes no offer of alternative evidence but, instead, demands that the evidentiary record be reopened for cross-examination on the ordinance and map. I decline to take that course, not only because the content of a zoning ordinance is essentially a question of law, but also because, in the absence of an offer of impeaching proof, I will not discount the certifications of public officials....

Secretary's Opinion at 5–6.

■ Further, the Zoning Ordinance and Map were properly admitted into the record based upon the Department's extensive expertise in municipal zoning, particularly the Department's authority and responsibility regarding the allowance and revocation of sign and highway occupancy permits. *See* 1 Pa.Code § 35.173 ("[o]fficial notice may be taken by the agency head or the presiding officer of such matters as might be judicially noticed by the courts of this Commonwealth, *or any matters as to which the agency by reason of its functions is an expert. ...*") (emphasis added). Again, this Court finds no

10. *See also* Pa. R.E. 902 (Self-Authentication)(although not binding on agencies that are not part of the unified judicial system, Pa.R.E. 101 (Scope and citation of rules), Pa.R.E. 902 is instructive. It provides that "[e]xtrinsic evidence of authenticity as a condition precedent to admissibility is not re-

quired with respect to the following ... Domestic Public Documents Under Seal ... [a] document bearing a seal purporting to be that of ... a political subdivision, department, officer, or agency thereof, and a signature purporting to be an attestation or execution.")

error with the Secretary's legal determination that the Hearing Officer properly admitted the Zoning Ordinance and Map into the record.

## Whether The Secretary Erred When He Concluded That The Doctrine Of Laches Was Not Applicable?

Adams contends that the Department's delay of approximately eight and as much as fifteen years from the commencement of the revocation proceedings and the issuance of the proposed report resulted in prejudice to Adams.[11]

In *St. Clair Area School District Board of Education v. E.I. Associates*, 733 A.2d 677, 681 (Pa.Cmwlth.1999), this Court addressed the issue of laches where the Commonwealth is a party:

> To impute laches against the Commonwealth, a stronger case of delay or acquiescence is necessary than when a mere private right is involved ... and laches is only imputed to the Commonwealth in rare cases. The Supreme

Court reaffirmed this principle in Weinberg [12], where it stated:

> We have also recognized the availability of the defense [of laches] against the Commonwealth and other governmental units in numerous cases and in a variety of situations, *although the courts will be generally reluctant to apply the doctrine against the government and will require a stronger showing by a defendant who attempts to apply the doctrine against the Commonwealth than by one who would apply it against an individual.*

Weinberg, 509 Pa. at 150, 501 A.2d at 243 (emphasis added). In addition, we have held that laches may not be raised as a defense in situations where the Commonwealth is attempting to enforce duties and obligations under its police power. Clearview Land Development Co. v. Commonwealth, 15 Pa.Cmwlth. 303, 327 A.2d 202 (1974).

Combining the test in Jacobs [v. Halloran, 551 Pa. 350, 710 A.2d 1098 (1998)] with the law imputing laches to the government, we conclude as follows: In

---

**11.** Essentially, Adams asserts that there are two possible periods of delay. The first is the approximately seven-year period between the discovery of the false zoning information and the Sign replacement (1988–1995) and the second is the approximately seven-year period between the administrative hearing and the issuance of the proposed report (October 24, 1996, and November 15, 2003).

**12.** In *Weinberg v. Pennsylvania State Board of Examiners of Public Accountants*, 509 Pa. 143, 501 A.2d 239 (1985), our Pennsylvania Supreme Court defined the criteria necessary to establish the equitable doctrine of laches:

> As a unanimous Court recently reiterated in Class of Two Hundred Administrative Faculty Members v. Scanlon, 502 Pa. 275, 279, 466 A.2d 103 (1983):
> "The application of the equitable doctrine of laches does not depend upon the fact that a definite time has elapsed since the cause of action accrued, but whether, under the circumstances of the particular case, the

complaining party is guilty of want of due diligence in failing to institute his action to another's prejudice."... The prejudice required is established where, for example, witnesses die or become unavailable, records are lost or destroyed, and changes in position occur due to the anticipation that a party will not pursue a particular claim.... Thus, it is clear that the application of the defense of laches requires not only an unjustified delay, but also that the opposing party's position or rights be prejudiced as a result of that delay.... Moreover, "[t]he question of laches is factual and is determined by examining the circumstances of each case."....

> Furthermore, the defense of laches is an affirmative defense and the burden of proving laches is, therefore, on the defendant/respondent .... (citations omitted).

*Weinberg*, 509 Pa. at 147–49, 501 A.2d at 241–42.

cases where the Commonwealth or a municipal government is the plaintiff, to dismiss a matter for lack of docket activity the defendant must show (1) a higher degree of prejudice than normally required under the third prong of the test articulated in Jacobs[13] . . . .

*St. Clair Area School District,* 733 A.2d at 681–82.

■ Here, Adams failed to show a "higher degree" of prejudice caused by the Department's delay as enunciated in *St. Clair Area School District.* In fact, Adams continued to derive revenue from the use of the illegal sign during the time period from the discovery of the sign replacement and the issuance of the revocation notice and the time period following the administrative hearing and the issuance of the proposed report. Also, Adams offered no evidence at the hearing that it attempted to contact the predecessor in interest or its representative or, for that matter, what relevant evidence these witnesses might provide. Next, even if Adams produced these witnesses there remains the question whether their testimony would be relevant considering that the Township's zoning scheme is largely a question of law. Last, after Adams appealed the Department's permit revocation it left the matter to languish on the docket from February 7, 1995, the date of Adams' appeal from the revocation notice/request to remove advertising permit until November 25, 2003, the date of the Hearing Officer's Proposed Report.

**Whether The Prosecutorial And Adjudicatory Function Of The Secretary Were Impermissibly Commingled?**

Adams contends that the Hearing Officer and the prosecuting attorney in the present matter were both employed by the Department's Office of Chief Counsel. Adams asserts that it was denied due process because the adjudicatory and prosecutorial functions of the Secretary were impermissibly commingled. *Lyness v. Pennsylvania State Board of Medicine,* 529 Pa. 535, 605 A.2d 1204 (1992).

In *Lyness,* the State Board of Medical Education and Licensure (Board)[14] convened an emergency meeting at the request of the Board's prosecuting attorney, Joseph E. Hagan, Esquire (Mr. Hagan) to consider whether Mr. Hagan could cite Samuel S. Lyness, M.D. (Dr. Lyness) "for a formal hearing, based upon a complaint of sexual molestation of a female patient which had been brought to his attention." *Id.* at 538, 605 A.2d at 1205. Mr. Hagan investigated the patient's allegation and on January 9, 1985, issued an administrative complaint and order to show cause, "lodging formal charges against Dr. Lyness." *Id.* at 538, 605 A.2d at 1205. After Dr. Lyness had been acquitted of criminal charges, the original administrative complaint was amended to include seven additional counts of patient sexual molestation. Following formal hearings, the Board-appointed hearing examiner found that six out of the seven complaining patients were credible. The hearing examiner directed that Dr. Lyness' medical license be sus-

---

**13.** In *Jacobs,* our Pennsylvania Supreme Court enunciated the following standard:

> To dismiss a case for inactivity ... there must first be a lack of due diligence on the part of the plaintiff in failing to proceed with reasonable promptitude. Second, the plaintiff must have no compelling reason for the delay. Finally, the delay must cause

*actual* prejudice to the defendant. (emphasis in original).
*Jacobs,* 551 Pa. at 358–59, 710 A.2d at 1103, citing *James Brothers Lumber Co. v. Union Banking and Trust Co.,* 432 Pa. 129, 247 A.2d 587 (1968).

**14.** The Board was the forerunner of the present State Board of Medicine.

pended for a five-year period. Dr. Lyness and Mr. Hagan petitioned for review to the Board. The Board affirmed the hearing examiner's findings but ordered the permanent revocation of Dr. Lyness' medical license. "Of the original member of the Board who had voted to initiate prosecution against Dr. Lyness in January of 1985, three Board members ... participated in the meeting in March of 1988 at which Dr. Lyness' license was revoked...." *Id.* at 539–40, 605 A.2d at 1206. On appeal, this Court affirmed.

Our Pennsylvania Supreme Court granted Dr. Lyness' petition for allowance of appeal and addressed the issue of whether the Board improperly commingled its prosecutorial and adjudicatory functions:

> What our Constitution requires, however, is that if more than one function is reposed in a single administrative entity, walls of division be constructed which eliminate the threat or appearance of bias. As then-Justice Nix stated so percipiently in concurrence in [*Commonwealth, Department of Insurance* v.] *American Bankers [Insurance*, 478 Pa. 532, 387 A.2d 449 (1978)], a 'mere tangential involvement' of an adjudicator in the decision to initiate proceeding is not enough to raise the red flag of procedural due process. American Bankers, 478 Pa. at 545, 387 A.2d at 456. Our constitutional notion of due process does not require a *tabula rasa.* Soja [v. Pa. State Police], 500 Pa. [188], at 197, 455 A.2d [613] at 617. *However, where the very entity or individuals involved in the decision to prosecute are 'significantly involved' in the adjudicatory phase of the proceedings, a violation of due process occurs* .... Such a conclusion is only made more compelling where, as here, the administrative Board has virtual *carte blanche* in reviewing the Hearing Examiner's findings and re-

placing it with its own adjudication, with very limited appellate review in the Commonwealth Court.

> ....

> Whether or not any actual bias existed as a result of the Board acting as both prosecutor and judge is inconsequential; the potential for bias and the appearance of non-objectivity is sufficient to create a fatal defect under the Pennsylvania Constitution. (footnote and citations omitted, emphasis in original and added).

*Lyness,* 529 Pa. at 546–48, 605 A.2d at 1210–11.

■ Here, Adams' due process rights were not violated. First, unlike the factual situation in *Lyness,* the Presiding Officer and Secretary were not involved in the initial decision to revoke Adams' sign Permit and order its removal. The initial decision rested with Naska, the Department's Beautification Manager. Naska was employed by the Department's highway beautification program while the Presiding Officer, an attorney for the Department, was appointed by the Governor's Office of General Counsel to serve in the Office of Chief Counsel. Second, the Presiding Officer and the Secretary did not play a role in Adams' determination to appeal. Third, although the Department's counsel and the Presiding Officer work for the Governor's Office of General Counsel, this fact does not present the "potential for bias" or "the appearance of non-objectivity." *See Lyness,* 529 Pa. at 548, 605 A.2d at 1210. The Department's counsel was not acting in a prosecutorial role that initiated the Sign revocation but merely represented the Department in response to Adams' appeal. Fourth, the Department's counsel and the adjudicator were separated by "walls of division" that kept their roles separate and insulated.[15] Fifth, the

---

**15.** 1 Pa.Code § 35.188 (Restrictions on duties    and activities) provides:

Secretary, and not the Presiding Officer, was the ultimate finder of fact and the Presiding Officer's role was merely to develop the record and propose a report to the Secretary. Last, the Secretary's *de novo* review ensured that the requirements of due process were satisfied.

### Whether Adams Due Process Rights Were Violated By The Delay?

Adams last argument is that he was denied due process due to the delay from the October 24, 1996, hearing and the issuance of the Proposed Report on November 25, 2003.

■■■ *"A petitioner seeking to establish that his or her due process rights have been violated has the burden of proving that some harm or prejudice to his or her interests was caused by the delay."* (emphasis added). *Williams v. Joint Operating Committee of the Clearfield County Vocational Technical School,* 824 A.2d 1233, 1238 (Pa.Cmwlth.2003), *quoting Kinniry v. Abington School District,* 673 A.2d 429, 433 (Pa.Cmwlth.1996). As noted earlier in this Court's laches analysis, Adams has failed to show "higher degree" of prejudice based upon the delay. *See St. Clair Area School District.* Therefore, this argument is without merit.

Accordingly, this Court affirms.

### ORDER

AND NOW, this 22nd day of September, 2004, the order of the Secretary of the Pennsylvania Department of Transporta-tion in the above-captioned matter is affirmed.

(a) Presiding officers may perform no duties inconsistent with their duties and responsibilities as such.

(b) Save to the extent required for the disposition of ex parte matters as authorized by law and by regulations of the agency, no presiding officer shall, in a proceeding which the agency head has directed be conducted under this subsection, consult a person or party on a fact in issue unless upon notice and opportunity for participants to participate.